# Exhibit A
*Sale and Assignment Agreement*

# BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

This bill of sale and assignment and assumption agreement ("Agreement") is entered by and between Giga Watt, Inc., a Washington corporation (the "**Buyer**"), and Enterprise Focus, Inc., a Washington corporation, dba megabigpower.com, which is owned by David M. Carlson, Jeffrey A. Field, and Rob Taves (collectively the "**Owners**"), and David M. Carlson, individually (collectively and jointly the **"Seller"**).

The Seller owns and operates block-chain business known as MegaBigPower located at 1250 N Wenatchee Ave H147, Wenatchee, Washington 98801 (the "**Business**"), with facilities located at 474 Highline Drive, Wenatchee, Washington 98802, in buildings designated A, B, C and H (the "**Wenatchee**") and 7906 Randolph Road, Moses Lake, Washington, 98837 ("**Moses Lake**").

The Seller has agreed to sell and the Buyer has agreed to purchase the Purchased Assets (as defined below).

The Owners collectively own 100% of the outstanding equity of the Seller and have agreed to join in this agreement for the purpose of making certain representations and agreements.

Therefore, the parties agree as follows:

1. Sale of the Purchased Assets; Assumption of the Assumed Contracts. Subject to the provisions set forth in this agreement, as of January 1, 2017 (the "**Effective Date**"), and in exchange for the valuable and equitable consideration set forth in paragraph 3 of this Agreement, the Seller hereby sells, conveys, assigns, and transfers to the Buyer the assets set forth on Schedule 1 (the "**Purchased Assets**") free and clear of any and all liens and encumbrances, and the Buyer hereby accepts the sale, conveyance, assignment, and transfer of the Purchased Assets and assumes the Buyer's obligations under the contracts listed on Schedule 1 (the "**Assumed Contracts**").

2. No Other Assumption of Liabilities. Except for the Assumed Contracts, the Buyer does not assume any obligation or liability of the Seller or the Owner, and the Seller or the Owner or both, as applicable, will continue to be liable for any and all liabilities of the Seller or the Owner or both. The Buyer does not assume any liability under the Assumed Contracts arising before the Effective Date. The Seller will not be responsible for any liability that arises from the Buyer's operation of the Business after the Effective Date.

3. Consideration. In exchange for the assets of the Seller sold, conveyed, assigned and transferred under this Agreement, the Buyer agrees to provide a consideration in the amount of $3,000,000 U.S. Dollars:

   a. First payment in the amount of $21,000 on January 15, 2017;

   b. Second payment in the amount of $21,000 on February 15, 2017

   c. One payment in the amount of $958,000 on March 15, 2017;

   d. One payment in the amount of $1,000,000 on September 15, 2017; and

   e. Final payment in the amount of $1,000,000 on March 15, 2018.

4. Security of Performance. The Buyer's performance shall be secured by 3,000,000 WTT tokens (the only type of tokens issued) placed to the Seller's account on March 22, 2017. Such WTT tokens shall not become the property of the Seller and shall not be sold, assigned, conveyed or transferred in any matter to the third parties unless the Buyer fails to perform its obligations under this Agreement.

5. <u>Method of Payment.</u> All payments shall be made in BTC (at the exchange rate published by Coinbase at the time of transfer) to the wallet address indicated by the Seller. Due to the difference in time and bank processing procedure, the payments shall be considered timely as long as the Buyer initiates a transaction on or before the due date. Upon receipt of each payment, the Seller shall transfer the equal amount of tokens back to the Buyer to the account provided by the Buyer.

6. <u>Business Operation Revenue</u>. The Buyer shall be entitled to all revenues generated with the use of Purchased Assets after the Effective Date. The Buyer shall be responsible for the ordinary and necessary expenses required to use the assets and generate revenue.

7. <u>Representations and Warranties.</u> The Seller and the Owners, jointly and severally, represent and warrant to the Buyer that all of the representations and warranties set forth on <u>Schedule 2</u> are true and correct in all respects as of the date of this agreement.

8. <u>Covenant Not to Compete; Nonsolicitation; Confidentiality.</u> The Seller and the Owners each agree to abide by the noncompetition, nonsolicitation, and confidentiality obligations set forth on <u>Schedule 3.</u>

9. <u>Proration of Expenses.</u> Any costs associated with operating the Business in the ordinary course, including but not limited to payroll expenses and utility or similar charges, payable with respect to the period in which the Effective Date falls will be prorated based on the actual number of days applicable to the pre-Effective Date and post-Effective Date occupancy and use. The Seller will be liable for the prorated amount of all such expenses during the period through the Effective Date, and the Buyer will be liable for the prorated amount of all such expenses during the period after the Effective Date.

10. <u>Default.</u> Seller shall be in default of this Agreement upon the occurrence of any of the following events: (i) Purchased Assets shall be found defective after the Effective Date of this Agreement; (ii) Purchased Assets shall become subject of any third party claims, which arise out of the events preceding the Effective Date; (iii) Purchase Assets shall become subject to injunction, arrest, or any other actions that limit Buyer's use of the Purchased Assets; (iv) Seller shall file for bankruptcy or insolvency, whether voluntary or involuntary, and Purchased Assets become part of the Seller's bankruptcy estate; and (v) any other limitations or restrictions on the use of Purchased Assets, which shall arise from the events preceding the Effective Date.

11. <u>Remedies.</u> In the event of default, Buyer, at its own discretion, may use any of the following remedies: (i) stop payments to Seller until default is cleared, (ii) satisfy the third party claims against the Purchased Assets and deduct this amount from the outstanding balance due to Seller; and (iii) use any and all remedies in law and in equity to protect its rights under this Agreement. Seller shall return all outstanding tokens to Buyer until the default is cleared. Seller agrees to be liable to pay all costs and expenses, including all reasonable attorney fees, incurred by Buyer in connection with enforcement of this Agreement.

12. <u>Survival.</u> Except as otherwise provided in this agreement, the representations and promises of the parties contained in this Agreement, including but not limited to Schedules 2 and 3, shall survive (and not be affected in any respect by) the statute of limitations as well as any investigation conducted by any party and any information which any party may receive.

13. <u>Governing Law; Venue.</u> The Agreement shall be governed by and construed in accordance with the law of the state of Washington.

14. <u>Construction.</u> The parties to this Agreement each acknowledge that: (i) this Agreement and its reduction to final written form are the result of good faith negotiations; (ii) the Parties

carefully reviewed and examined this Agreement with their own independent legal counsels before the execution; and (iii) all Parties had the opportunity to and did in fact participate in drafting the final terms of this Agreement.

15. <u>Assignment.</u> No party may assign either this agreement or any of its rights, interests, or obligations hereunder without the prior written approval of each other party, except that the Buyer may assign any or all of its rights under this agreement, in whole or in part, without obtaining the consent or approval of any other party, (1) to any current or future affiliate of the Buyer, (2) to any entity into which the Buyer may be merged or consolidated, (3) in connection with any acquisition, restructuring, merger, conversion, or consolidation to which the Buyer may be a party, or (4) to a lender to the Buyer or its affiliates as collateral security for current or future obligations owed by the Buyer or its affiliates to the lender.

16. <u>Notices.</u> All notices and other communications under this agreement must be in writing and given by first class mail, return receipt requested, nationally recognized overnight delivery service, such as Federal Express, or personal delivery against receipt to the party to whom it is given, in each case, at the party's address set forth in this section 11 or such other address as the party may hereafter specify by notice to the other parties given in accordance with this section. Any such notice or other communication will be deemed to have been given as of the date the applicable delivery receipt for such communication is executed as received or in the case of mail, three days after it is mailed.

If to the Seller or the Owners:

1250 N Wenatchee Ave H147
Wenatchee, Washington 98801

If to the Buyer

170 S. Lincoln, Ste. 100
Spokane, Washington 99201

17. <u>Cancellation or Modification.</u> This Agreement may be cancelled or modified only by a separate written Agreement signed by both the Seller and the Buyer.

18. <u>Miscellaneous.</u> This agreement contains the entire agreement between the parties with respect to the subject matter hereof and all prior negotiations, writings, and understandings relating to the subject matter of this agreement are merged in and are superseded and canceled by, this agreement. This agreement may not be modified or amended except by a writing signed by the parties. This agreement is not intended to confer upon any person or entity not a party (or their successors and permitted assigns) any rights or remedies hereunder. This agreement may be signed in any number of counterparts, each of which will be an original with the same effect as if the signatures were upon the same instrument, and it may be signed electronically. The captions in this agreement are included for convenience of reference only and will be ignored in the construction or interpretation hereof. If any date provided for in this agreement falls on a day which is not a business day, the date provided for will be deemed to refer to the next business day. Any provision in this agreement that is held to be invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction will be ineffective only to the extent of such invalidity, illegality, or unenforceability without affecting in any way the remaining provisions hereof; provided, however, that the parties will attempt in good faith to reform this agreement in a manner consistent with the intent of any such ineffective provision for the purpose of carrying out such intent. The Exhibits and Schedules to this agreement are a material part of this agreement and are incorporated by reference herein.

Each of the undersigned has caused this bill of sale and assignment and assumption agreement to be duly executed and delivered as of the date first written above.

**BUYER:**

Giga Watt, Inc., a Washington corporation

_____          _____
By: Nikolay Evdokimov, President          Date:

**SELLER:**

Enterprise Focus, Inc., a Washington corporation

_____          _____
By: David M. Carlson, CEO                 Date:


_____          _____
David M. Carlson, individually            Date:

**OWNERS:**

_____          _____
David M. Carlson                          Date:


_____          _____
Jeffrey A. Field                          Date:


_____          _____
Rob Taves                                 Date:

4

## Schedule 1
### Purchased Assets

"**Purchased Assets**" means all of the assets of the Seller primarily related to the operation of the Business, including the following assets, but specifically excluding the Excluded Assets:

a) all books, records, mailing lists, customer lists, advertising and promotional materials, equipment maintenance records, and all other documents used by the Seller in the Business (whether in hard copy or electronic form);

b) all computers and related software, websites, office equipment, and office supplies used by the Seller in the Business;

c) fixtures and furniture used by the Seller in the Business;

d) phone system and any other technological equipment used by the Business;

e) all equipment, materials, inventory, stock, supply and technology used by the Business;

f) Wenatchee and Moses Lake leases and facility infrastructure (Exhibit 1);

g) equipment of the Wenatchee unused power infrastructure (Exhibit 2);

h) inventory and stock (Exhibit 3);

i) digital assets (Exhibit 4);

j) the trade names "Mega Big Power" and "MegaBigPower" and associated goodwill and all copyrights, patents, trademarks, trade secrets, brands, and other intellectual property and associated goodwill;

k) conceptual design of the mining pods, related technology, intellectual property and all rights associated with it;

l) all intellectual property, including software, created by the Seller within 3 years prior to the Effective Date;

m) the internet domain name www.megabigpower.com and all variants owned by the Seller and/or used in the Business; and

n) all social media accounts, including, without limitation Facebook, Google Plus, LinkedIn, Twitter and YouTube accounts, used in the Business.

"**Excluded Assets**" means the following:

a) all cash of the Seller on the Effective Date;

b) all accounts receivable of the Seller outstanding at the Effective Date; and

c) all accounts payable of the Seller outstanding at the Effective Date.

"**Assumed Contracts**" means the following contracts:

a) lease agreements for the Eller St house/office, building A, building B, building C, building H, and Moses Lake facility;

b) co-location and/or service agreements, hosting contracts, and other legal agreements for hosting of mining equipment between the Seller and its customers; and

c) contracts with PUD.

## Schedule 2

## Representations and Warranties

1. **Capitalization.** The only equity owners of the Seller is the Owners and no person has any existing right to purchase any equity of the Seller.

2. **Consents.** The Seller is not required to obtain the consent of any party to a contract or any governmental entity in connection with the execution, delivery, or performance by it of this agreement or the consummation of the transactions contemplated in this agreement.

3. **Compliance with Laws.** With respect to the operation of the Business by the Seller before the Effective Date, the Seller and its employees and officers are and at all times have been in compliance in all material respects with each law applicable to the Seller or to the operation of the Business.

4. **Taxes.** The Seller has, in respect of the Business, paid all taxes that have become due under tax returns or under any assessment that has become payable or for which the Buyer may otherwise have any transferee liability. All monies required to be withheld by the Seller from employees for income taxes and social security and other payroll taxes have been collected or withheld and either paid to the respective governmental bodies or set aside in accounts for such purpose.

5. **Litigation.** There are no claims or suits pending or, to the Seller's or Owners' knowledge, threatened by or against the Seller (1) relating to or affecting the Business or Purchased Assets or (2) by or against any employee of the Seller relating to or affecting the Business or Purchased Assets. There are no judgments, decrees, orders, writs, injunctions, rulings, decisions, or awards of any court or governmental body to which the Seller is a party or is subject with respect to any of the Purchased Assets is subject.

6. **Financial Information; Ordinary Course.** The financial information the Seller provided to the Buyer is accurate, correct, and complete, is in accordance with the books and records of the Seller, and presents fairly the results of operation and financial condition of the Seller's Business. The Seller has operated the Business in the ordinary course before the Effective Date.

7. **Title; Condition of Purchased Assets.** The Seller has good and marketable title to all of the Purchased Assets free and clear of all liens and encumbrances. Pursuant to this agreement, the Seller conveys to the Buyer good and marketable title to all of the Purchased Assets, free and clear of all liens and encumbrances. The inventory is salable in the ordinary course of business and consists of items that are current, standard, first-quality, and fit for the intended purpose. All equipment and signs are in working order and the premises will pass all inspections necessary to conduct the Business.

8. **Product Warranties.** The Seller provides no express or implied warranty, indemnification, or guarantee to any of its customers at any time in excess of the warranty provided by the applicable product manufacturer. Each product sold or service rendered by the Seller is and has been sold or rendered, as applicable, in conformity with all applicable contractual commitments and all express and implied warranties, and the Seller does not have any liability (and there is no basis for any present or future proceeding) for replacement or repair thereof or other damages, liabilities, or obligations in connection therewith.

9. **Capacity of Purchased Assets.** The Seller has 2.5MW in Wenatchee, including 1.9MW usable capacity (after safety buffer), and 2.5MW in Moses Lake, out of which only 2MW is being used as of the Effective Date of this Agreement. The Seller also has additional equipment capable of delivering 1MW (800kW after security derate) of power capacity.

## Schedule 3
### Covenant Not to Compete; Non-Solicitation; Confidentiality

1. The Seller and the Owners covenant and agree that neither the Seller nor the Owners will: (1) for a period of 2 years following the Effective Date own, manage, or be employed by (whether as an employee or independent contractor) a competing business within 500 miles of the Business; (2) or for a period of 2 years following the Effective Date recruit or employ (whether as an employee or independent contractor) any of the Business's current employees or independent contractors.

2. The Seller and the Owners shall hold the Confidential Information in confidence and shall not use the Confidential Information for any purpose other than in furtherance of the Buyer's operation of the Business without the Buyer's express written consent. The Seller and the Owners recognize that Confidential Information involves one of the Buyer's valuable and unique assets. "**Confidential Information**" means information directly or indirectly involving the Business that is not available or open to the public generally.

3. The Seller and the Owner each has carefully read and considered the provisions of this Schedule 3 and, having done so, agrees that the restrictions set forth herein are fair and reasonable given the terms and conditions of this agreement, the nature of the Seller's and its affiliates' business, the area in which the Seller and its affiliates market their products and services, and the consideration being provided pursuant to this agreement. In addition, the Seller and the Owners specifically agree that the length, scope, and definitions used in the covenant not to compete and other restrictions set forth in this Schedule 3 are fair and reasonable.

4. The Seller and the Owner each acknowledges and agrees that its breach of any of the agreements in this Schedule 3 would result in irreparable damage and continuing injury to the Buyer. Therefore, in the event of any breach or threatened breach of such agreements, the Seller and the Owner each agrees that the Buyer will be entitled to an injunction from any court of competent jurisdiction enjoining such person or entity from committing any violation or threatened violation of those agreements.

**Exhibit 1 to Schedule 1**

**Wenatchee Leases & Facility Infrastructure:**

| | |
|---|---|
| H building | 1.75MW |
| A building | Storage |
| B building | 225kW |
| C building | 225kW |
| Eller St House/Office | |

MBP Electrical Infrastructure generally consists of tenant improvements to leasehold property. It represents a long term usable capital investment that is producing income.

Typical components facility infrastructure are:
Deposits w PUD
Deposits with Landlord for buildings A, D, C, and H
Underground conduits/trenches
Power pole
Transformers
Vaults
Secondary power (1" conductors)
2400 Amp Load Centers (main disconnect)
Distribution conductors/conduits
Distribution breaker panels (400 Amp)
30A Breakers in each panel (typ. 48)
Branch circuit wiring
Cable tray
Twistlock Power Receptacles
Network wiring to racks
Security System
Security Door
Security Cameras
Filter Housings & Filters
Supplemental Fans
Evaporative (Swamp) Coolers

**Moses Lake Lease and Facility Infrastructure:**

Deposit with Landlord

| | | |
|---|---|---|
| Racking | 156 | |
| PDUs | 625 | |
| Network Switches (in rack) | 65 | 16-24 port switches |

8

**Exhibit 2 to Schedule 1**

MBP has some uninstalled power infrastructure, ready for a project. This equipment is new and never used. It was installed into a project in Chelan County, and then removed as a result of policy changes in that county.

1MW system:

| | |
|---|---|
| 480V 225kW dry type transformer | 4 |
| 480V mains breakers | 2 |
| 208V Load Centers (400A disconnects) | 4 |
| 400 Amp Breaker Panels w/breakers | 12 |

Bus duct, conduits

Rock Island
Cable Tray, Breakers, Branch Circuits for 300kW currently installed at Rock Island

**Exhibit 3 to Schedule 1**

| | |
|---|---:|
| Meanwell Power Tails V1 (12 gage speaker wire @ 18") | 1931 |
| Meanwell Power Tails V2 (10 gage water resistant wire @ 18") | 569 |
| Meanwell Power Cables (3x 18 gage wire with single exposed end and C-14 Plug @ varried lengths) | 4662 |
| C13-C14 Power Cable (3x 18 gage wire) | 2465 |
| Version 2.2 Bitfury H-card PCI (Working) | 219 |
| Version 1.2 Bitfury H-card (Working) | 2674 |
| Version 1.2 Bitfury H-card (Dead) | 379 |
| Version 3.0 Bitfury M-card PCI (Working) | 45 |
| Version 3.0 Bitfury M-card PCI (Dead) | 115 |
| SanDisk 4GB SD memory card | 2431 |
| SanDisk 8GB Micro SD memory card | 244 |
| SanDisk Micro SD to SD memory card adaptor | 147 |
| HP Envy Desktop | 4 |
| HP Pavilion Desktop | 1 |
| Dell Inspiron Desktop | 5 |
| Raspberry Pi version B (working) | 269 |
| Raspberry Pi version B (Dead) | 112 |
| Raspberry Pi version B+ (working) | 51 |
| Lasko 20' fan | 820 |
| Category 5e Network Cable (average) | 71429 feet |
| Version 2.3 Bitfury M-card (working) | 44 |
| Version 2.3 Bitfury M-card (Dead) | 18 |
| Version 1.0 Bitfury H-card PCI Octal (Working) | 283 |
| Version 1.0 Bitfury M-Card (Working) | 146 |
| Version 1.0 Bitfury M-Card (Dead) | 45 |
| PDU in stock/unused (various) | 1679 |
| APC Power Distrobution Unit (12 Socket) | 6 |
| APC Power Distrobution Unit (16 Socket) | 91 |
| APC Power Distrubution Unit (24 Socket) | 220 |
| Avocent Power Distrobution Unit (20 Socket) | 15 |
| Meanwell 600 watt power supply | 1165 |
| Meanwell 350 watt power supply | 1517 |
| Meanwell 450 watt power supply | 1821 |
| MSI z77a-gd65 Motherboard | 14 |
| Gigabyte G1 Sniper Motherboard | 15 |
| ASRock z77 Professional M Fatal1ty Motherboard | 3 |
| ASRock z77 Pro4-m Motherboard | 25 |
| Gigabyte gv-r795wf3-3gd revision 2.0 | 81 |
| MSI r7950 Twin FrozrIII 3gd5/oc | 15 |
| HIS Radeon HD 7950 3GB | 5 |

| Item | Qty |
|---|---|
| MSI r9 280x Gaming 3G | 18 |
| Sapphire HD 7950 3GB GDDR5 Dual-x | 13 |
| Sapphire Vapor-X 9r 280X 3G GDDR5 | 10 |
| Sapphire Vapor-X HD 7950 3G GDDR5 | 1 |
| NVIDIA GeForce GTX 780 3GB GDDR5 | 2 |
| ASUS GTX780-dc2oc-3gd5 | 20 |
| Sapphire r9 290x 4GB GDDR5 | 1 |
| G.Skill Sniper DDR3 1330 (8GB 2x4GB) | 29 |
| Kingston KHX 1600c9d3k2/8gx (8GB 2x4GB) | 28 |
| Intel i5-4440s2.8GHz 6MB cache 65w | 57 |
| SanDisk 64GB Solid State Drive | 7 |
| Kingston 60GB Solid State Drive | 31 |
| Western Digital WD3200bpvt | 28 |
| Version 2.2 Bitfury H-card PCI (Dead) | 313 |
| Version 1.0 Bitfury H-card PCI Octal (Dead) | 156 |
| Power Cable C-19 to C-14 (3x18 gage) | 20 |
| USB Extention cables (6ft.) | 535 |
| Prototype M-6 Boards (Firebomb boards) | 153 |
| C-14 to 5-15 1 foot adapter cable | 337 |
| 4 port USB wall adaptor | 204 |
| Molex to 3-pin x 6 port adaptor (Fan adaptor) | 1000 |
| 3-socket groundless extention cable | 190 |
| 16 Port Switch (various vendors) | 383 |
| 24 Port Switch (various vendors) | 75 |
| Boxes (stack of 25) | 32 |
| USB Extention cables (3ft.) | 415 |
| Dead 1600 watt computer power supply | 1 |
| Dead 1200 watt computer power supply | 49 |
| Dead 850 watt computer power supply | 2 |
| Dead 600 watt computer power supply | 64 |
| 80mm Stealth case fans | 3500 |
| 1600 watt computer power supply | 10 |
| 1200 watt computer power supply | 473 |
| 800 watt computer power supply | 12 |
| 600 watt computer power supply | 885 |
| 500 watt computer power supply | 104 |
| 48 port main switch | 13 |
| M-6 48 slot PCI board (working) | 23 |
| M-6 48 slot PCI board (dead) | 25 |
| M-6 PCI BioInfo Card (working) | 12 |
| M-6 PCI BioInfo Card (dead) | 114 |
| 3 socket adaptor | 143 |
| Racks | 287 |

| | |
|---|---|
| rolling step ladders | 4 |
| utility carts | 4 |
| folding tables | 8 |
| pallet jacks | 4 |
| Forklifts | 2 |
| Ford F650 (title attached) | 1 |
| various tools, chop saw, shop vac | |
| D-Crates | 7 |
| Big Blue Ventilation Fans | 20 |
| Large Pallet Racking (Rock Island) | 2 |
| Filter Housings | 50 |
| Washable anti-static filters | 85 |
| Evap Coolers | 6 |

19-80012-FPC    Doc 1-1    Filed 04/22/19    Entered 04/22/19 20:18:22    Pg 13 of 14

**Exhibit 4 to Schedule 1**

| Item | Description |
| --- | --- |
| Customer Account Dashboard | Basic password protected client login web system. Collects performance & payout data from pool & wallet for simple display to clients |
| Payout Splitter System | Payout splitter is a cron job/database tool that splits an incoming payment by percentage according to client settings stored in database, then sends appropriate BTC to target addresses. |
| BitMain Data Collector | PHP script to gather data from miners, in order to identify problem rigs |
| API integrations | Code to gather api data from SlushPool, AntPool, Coinapult, etc |
| MegaBigPower.com | Domain, brand & web content |
| Customer Lists, Email Inquiries, etc | Retail Customers from 2013, Inquiries for buyback & franchise programs |
| Private Keys | Addresses that mined about 35,000 BTC (can be checked on Blockchain) - for clarity, no BTC is being sold hereby |
| Pod Design | |
| Vanity Bitcoin Address Generation/Password Recovery System | Address Miner (brute force BTC address generation), database, web front end. Allows users to specify custom addresses to mine for (e.g. 1megabigpower729DQdG7qrNMbmvYgmekh). Farms those targets out to GPUs for generation. Can also be used to create a farm for password recovery |